24243. TITSHAW *v*. THE STATE.

DECIDED APRIL 8, 1935.

*D. M. Pollock, L. P. Chick, Joe Quillian*, for plaintiff in error.
*Henry H. West, solicitor-general*, contra.

MACINTYRE, J. Ray Titshaw was tried under two indictments, one charging him with committing the crime of assault with intent to murder by shooting Chester Camp with a shotgun, and the other with committing assault with intent to murder by shooting Joe B. Camp Jr. with a shotgun. The jury found the defendant guilty of "shooting at another," under each indictment, and, his motion for a new trial being overruled, he excepted.

It appears from the evidence that the house in which Mrs. Martha A. Titshaw and her son, Ray Titshaw, were living had been sold under some sort of foreclosure proceeding, and that the

father of the Camp boys had purchased it; that Mrs. Titshaw claimed that the house was hers and did not want to move out; that on Friday before the shooting on the following Monday, the Camp boys went to the Titshaw home to advise the Titshaws that their father wanted possession of the premises on Monday; and that when the Camp boys went back early Monday morning to see if the Titshaws had moved, and knocked on the door, the defendant fired a shotgun twice through the door of the house, wounding both of the Camps. Dr. John Gerdine testified, in part, as follows: "Chester was shot in the face, and practically altogether on the left side, above his forehead, around under his eyes and down on the side of his face, in his neck and clavicle and the sternum on the chest. There was about twenty-five or twenty-eight shot in Chester. They were B. B. shot and plain. . . The other boy was shot about two inches below the shoulder, on down about one and one-half inches . . above the elbow joint. . . These shot went through the arm, and were two kinds of shot, both plain and brass-cap. . . There were a great many splinters in Chester's face. . . There were a good many in his [Joe's] face. The shot went in the jawbone, shot out two teeth, one or two into the eyes and into the face. . . If the shot had been made from ten or twelve feet away and there was no door between them, it would have killed the boys."

The following testimony of Chester Camp sufficiently shows the State's version of the shooting: "We walked up on the porch and knocked on the door and no one answered, and knocked on the door the second time, and Ray says: 'What do you want?' He [Joe] says: 'I want to see Mrs. Titshaw.' And Ray says: 'Have you got the law with you?' And Joe says: 'No, if you want to do what is right, won't need no law.' And he shot us both. . . We were not armed, and we didn't do anything to Ray Titshaw to cause him to shoot us. We were over on a peaceful mission and didn't have any guns with us. We didn't have any notice that we were going to be shot. . . Later I saw that the door had two cracks in it, and you could see up to my knees and see up to my brother's knees, and the person back of the door could see how many people were out there, but from the outside you couldn't see inside on account of the darkness. It's about five feet high from the floor where one of the shots went in, and the other a little over

four feet. My brother didn't try the knob on the door when he first walked up there, but knocked. I do not know whether the door was locked or not." Joe B. Camp Jr. testified substantially as did his brother.

G. D. Still, sworn for the defendant, testified in part that he was present on the first visit of the Camp boys to the Titshaw home, and that "the least boy [Joe B. Camp Jr.] . . said they had bought the place and was going to move there and work it or wade through blood knee deep, . . said they were going to move in Monday and they better get out Saturday;" and that "Ray was in the house in the door and Roy stood there and didn't open his mouth."

Mrs. Titshaw, the mother of Ray and Roy Titshaw, testified that when the Camp boys came to her home Friday and told her "they had bought the place," she said: "This is my place, paid for with my inheritance from my people." Mrs. Titshaw continued to testify as follows: "So when they got in front of the porch . . they stopped and began multiplying words, and said: 'I am coming to take possession of this property or wade through blood to my knees, and, if it takes it, to my neck.' . . So on Monday morning they came to my front door and began to talk to my son Ray. . . So I heard my son Ray say: 'Please go away, for my mother don't want to be worried any more.' . . I heard jerking and surging at the door. I got half way and two shots were fired through the door."

The defendant began his statement to the jury with a long and vivid account of how the father of the Camp boys stopped him on the road "two years ago" and beat him unmercifully. He then proceeded to state to the jury that the Camp boys came to his mother's home on Friday when he was present; that Joe had a pistol in his pocket, and said, "You better be moving tomorrow; me and my father are coming to move you Monday if it takes blood up to my knees or up to my neck." In regard to the actual shooting, the defendant stated to the jury: "Monday morning they came back and knocked on the door. . . And he says: 'Hello Ray.' I says: 'Who is that?' He says: 'Joe and Chester Camp.' I says: 'Have you got the law with you?' He says: 'We are the law ourselves, open the door.' I says: 'No, you better be leaving here if you don't want to have trouble;' and he

pushed against the door then and I shot through the door, and he either dropped a hammer or a pistol, when the first shot was fired, on the floor. I shot again, and then I backed from where I was standing and loaded my gun and came around back of the house. If I had any intention of murdering these two men, I could have murdered them down the road. I haven't any murder in my heart. A man can be forced to do a thing in his home after pleading and begging these boys not to treat his old mother who has raised him like she has been treated and I have been treated. You see the condition she is in."

Felker Lewis testified in part: "I have heard her [Mrs. Titshaw's] condition is highly nervous, and I have heard that she has been sent to the asylum twice. She is very old."

In its last analysis, the question presented by the general grounds and the last four special grounds of the motion for a new trial is whether or not the offense of "shooting at another" was in the case. If it was not, the verdict can not stand and the court's charges upon that subject were unwarranted and erroneous. It is true that "a verdict of shooting at another is not a legal finding where the evidence demands the conclusion that the defendant was either guilty of assault with intent to murder, or was not guilty at all." *Fallon* v. *State*, 5 *Ga. App.* 659, 661 (63 S. E. 806), and cit. It is of course equally true that in such a case it would be error for the court to charge upon shooting at another. To sustain their contention, counsel for movant rely upon the leading case of *Kendrick* v. *State*, 113 *Ga.* 759, 761 (39 S. E. 286), where the court said: "The evidence for the State, if credible, absolutely demanded a verdict of guilty of assault with intent to murder. The defendant introduced no evidence, but simply made a statement in which he denied any connection whatever with the alleged assault, and set up an alibi. If the jury believed the testimony for the State, they should have convicted the accused of assault with intent to murder, the crime charged in the indictment. If they believed the statement of the prisoner, they should have acquitted him entirely. Under the testimony and the statement, the issue was clear cut: guilty of assault with intent to murder, or guilty of nothing. There was no middle ground." "A person is guilty of the statutory offense of shooting at another when he, without justification, shoots at another, without the intention of committing

murder; and this lack of intention to commit murder may exist from the fact that he shot without any specific intent to kill, or from the fact that if death had ensued from the wound, the homicide, under the circumstances surrounding it, would not have been murder, but would have been manslaughter in one of its grades." *Fallon* v. *State,* supra. In *Chester* v. *State, 3 Ga. App.* 332 (59 S. E. 843), it was held: "While a conviction of the offense of shooting at another is not legal where the evidence as a whole shows that the defendant deliberately shot the prosecutor, either maliciously or else justifiably, yet this is not true where, under any phase of the evidence, a shooting unlawful but not malicious can be inferred." "Where, under the defendant's statement taken as a whole, the shooting was justifiable, but where, discarding it in part and taking it in part, the shooting was not justifiable and yet not malicious, the jury were authorized to find him guilty of shooting at another." In *Lewis* v. *State,* 14 *Ga. App.* 503 (81 S. E. 378), this court said: "To constitute the offense of assault with intent to murder, there must be a specific intent to kill. This intent is not necessarily or conclusively shown by the use of a weapon likely to produce death. The jury should have been given the discretion, under the proper instruction from the court, to convict of a lesser offense included in the higher felony charged, if they believed that the evidence failed to show a specific intent to kill." See, in this connection, *Posey* v. *State,* 22 *Ga. App.* 97 (95 S. E. 325), and cit.

The facts of the case at bar completely differentiate it from *Kendrick* v. *State,* supra, and similar cases. In the instant case the State introduced numerous witnesses, and the defendant introduced several witnesses and made a long statement to the jury. In considering the case, we must look to the entire brief of evidence, realizing that the jury had the right to reach any material conclusion warranted by the evidence and the defendant's statement, or by the evidence or the defendant's statement, or by a part of the evidence, or by a part of the defendant's statement. We have undertaken to set out the material parts of the evidence and the defendant's statement with sufficient fulness to illustrate the issues in the case and avoid repetition. Applying the law to the facts of the case, we are satisfied that the jury were warranted in concluding (a) that the shooting was not justifiable; (b) that there was no intention to kill, and, therefore, no assault with intent to

murder; and (c) that the defendant was guilty of shooting at another. In connection with the conclusion last reached, we call special attention to the defendant's statement. Had the shooting resulted in a homicide, we are satisfied that a verdict of voluntary manslaughter would have been supported by the evidence, and, if this be true, the verdict finding the defendant guilty of shooting at another was proper. See, in this connection, *Powers* v. *State*, 44 *Ga. App.* 794, 797 (163 S. E. 257), and cit. It follows that the trial judge did not err in overruling either the general grounds of the motion for a new trial, or the special grounds complaining that he charged the law of shooting at another.

The first special ground is in the following language: "Because the court erred in charging the jury as follows: 'Justification homicide is the killing of a human being by commandment of the law in execution of human justice; by permission of the law in advancement of public justice; in self-defense of. habitation, property or person, against one who manifestly intends and endeavors, by violence or surprise, to commit a felony on either; or against any person who manifestly intends and endeavors in a riotous and tumultuous manner, to enter the habitation of another for the purpose of assaulting or offering personal violence to any person dwelling or being therein. If after persuasion, remonstrance, or other gentle measures used, a forcible attack and invasion on the property or habitation of another can not be prevented, it shall be justifiable homicide to kill the person so forcibly attacking and invading the property or habitation of another.' Said charge was error for the reason that it erroneously instructed the jury that in order for the defendant to be justified in having shot it was necessary to have shot the person whom he was charged with having shot, under the following circumstances: 1. That such person was manifestly intending or endeavoring by violence or surprise to commit a felony, either on the defendant or his habitation. 2. That such person in a riotous and tumultuous manner, to enter the habitation of the defendant for the purpose of assaulting or offering personal violence to some person, dwelling or being therein. Then, under the law, the defendant was justifiable in. shooting the person he was charged with having shot, if after persuasion, remonstrance, or other gentle measures by the defendant, a forcible invasion of the defendant's habitation was being made by said per-

son and it was necessary, in order to eject such person from the defendant's habitation, for the defendant to shoot him. This error was nowhere cured in the court's charge to the jury, and was hurtful to the defendant for the reason that it deprived him of the defense that he had shot the person he was accused with having shot, in the necessary effort to prevent such person from violently entering his habitation, unless he went further than the law required him to, and proved that he shot him under the circumstances which it is above alleged was required by said charge." While the ground is quoted in totidiem verbis, it may be well to state that it appears from the charge sent up in the record that the court did not frame his charge in the language of the ground, but did as a matter of fact, in charging the law of justifiable homicide, follow the Code of 1933, § 26-1011 (Penal Code of 1910, § 70). The latter part of the excerpt complained of is in the language of the Code of 1933, § 26-1013. "An exception to a charge not erroneous in the abstract must point out its specific defect, and the attention of the court must be specifically directed to the error in the instruction alleged to be erroneous." *Wiley* v. *State,* 3 *Ga. App.* 120 (4) (59 S. E. 438). The charge follows the Code, and is obviously a correct statement of the law. The assignment of error does not convey clearly to our minds what specific defect in the charge is complained of. In these circumstances, we hold that the ground discloses no reversible error.

The second special ground complains of the following charge of the court: "Now I further charge you, if the circumstances surrounding the defendant, as they appeared to him at the time, were sufficient to excite the fears of a reasonable man, the killing would be attributed to them, in the absence of proof to the contrary, and the defendant therefore excused for his conduct." It is insisted that the charge was erroneous "because it entirely deprived him [the defendant] of the defense he had under the law of the fears of a reasonable man, if the jury should believe that there was evidence to the contrary, whether the jury believed such evidence to be true or not." In immediate connection with the foregoing quoted matter, and as a composite part of the charge upon "reasonable fears," the court continued as follows: "The sufficiency of the fears is a question for the jury. The defendant was justifiable if there be a reasonable doubt in the minds of the jury as to

whether he acted under such fears, or had reason to feel that it was necessary to kill in order to save his own life, or protect his home from invasion. . ." Furthermore, the court charged fully section 26-1012 of the Code of 1933 (Penal Code of 1910, § 71). While the phrase "in the absence of proof to the contrary" might well have been omitted, we are quite sure that when the excerpt is construed with its context and other portions of the charge, no juror of ordinary intelligence would have concluded from it that the court meant that the mere introduction of evidence, whether believed by the jury or not, would refute proof that the defendant acted under the fears of a reasonable man. We hold that the ground discloses no reversible error.

In conclusion, we hold that the trial judge did not commit reversible error for any reason assigned in the motion for a new trial.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*